UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-11343-RGS

DONALD HAMMOND

v.

PROCTER & GAMBLE HEALTH AND LONG TERM DISABILITY PLAN

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

July 11, 2019

STEARNS, D.J.

*Pro se* plaintiff Donald Hammond brought this action under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132, seeking review of defendant Proctor & Gamble Health and Long Term Disability Plan's (P&G Health) denial of benefits under a long-term disability insurance plan sponsored by his former employer, the Proctor & Gamble Company (P&G Company). Hammond claims that P&G Health arbitrarily and capriciously determined that he was only partially, and not totally, disabled within the meaning of the plan and was therefore ineligible to receive disability income benefits beyond the fifty-two-week lifetime limit set for partial disability. Because there is substantial evidence in the administrative record (A.R.) to support its ineligibility

determination, P&G Health's motion for summary judgment will be allowed.

## BACKGROUND

Hammond began his employment with the P&G Company on April 23, 1979, as a production mechanic for the Gillette Company[1] working 12-hour shifts alternating between three or four days per week.  In the relevant time frame, Hammond participated in employee short term disability (STD) and long-term disability (LTD) plans provided by P&G Company.  Effective beginning on July 1, 2014, the P&G Disability Benefit Plan and the P&G Health and Long-Term Disability Plan provided STD and LTD benefits respectively.  On April 1, 2017, P&G Company consolidated the two 2014 plans into the P&G Health and Long-Term Disability Plan (collectively with the 2014 plans, Benefit Plans).

### *Plan Terms and Conditions*

Under the Benefit Plans, a participant may receive STD benefits of two-thirds pay up to 52 weeks for "disability due to qualifying off-the-job illness, injury, pregnancy, or childbirth."  A.R. (Dkt # 26) at 737.  For disabilities beyond 52 weeks, LTD provides half-pay and "may be paid until age 65." *Id.*

In addition, the Benefit Plans set a 52-week maximum lifetime benefit for a participant determined to be "Partially Disabled."  A Partial Disability

---

[1] P&G Company acquired Gillette in 2005.

is

> a mental or physical condition resulting from an illness or injury because of which the participant is receiving medical treatment and cannot perform the regular duties of his or her current job but can perform other useful roles at the same Company site or at other jobs outside the Company.  Thus, a partially disabled participant is not necessarily prevented from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

*Id.* at 303.  In contrast, no lifetime limit applies to a "Totally Disabled" participant.  Total Disability is defined as

> a mental or physical condition resulting from an illness or injury that is generally considered totally disabling by the medical profession and for which the participant is receiving regular recognized treatment by a qualified medical professional.  Usually, total disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home.

*Id.*

### ***Hammond's Medical and Claims History***

Hammond suffers from a history of plantar fasciitis and peroneal tendinitis of the right foot, which were first diagnosed in 2012 and 2014, respectively.  In April of 2015, Hammond's physician, Dr. Michael Tremblay, diagnosed a calcaneal spur and plantar facial fibromatosis of the right foot.  Hammond's condition caused him to take a brief leave of absence, followed by a period of part-time work in May of 2015, before he returned to his regular work schedule on June 1, 2015.  On May 5, 2015, Hammond applied

3

for and received STD pay.  In September of 2015, he suffered a relapse and returned to working part-time shifts, again with STD pay.  P&G Health made no determination as to Hammond's disability status at this time.

Hammond met with his treating podiatrist, Dr. Timothy Curran, seven times for diagnosis and treatment between his relapse in September of 2015 and June of 2016.  Following each of the seven appointments, Dr. Curran diagnosed Hammond with either plantar fasciitis or peroneal tendinitis of the right foot and recommended that Hammond restrict his work to six or eight hours per day.[2]  Hammond also received a second opinion from an orthopedic surgeon, Dr. Eric Bluman, in May and June of 2016.  He diagnosed Hammond with peroneal tendinitis, placed him first in a "tall boot" to immobilize the foot, and then in an Allard brace.  Unlike Dr. Curran, Dr. Bluman recommended that Hammond refrain from work pending a reevaluation.

Gillette permitted Hammond to work part-time while he was on STD until June 8, 2016, when it informed Hammond that it could no longer accommodate his work restrictions.  On June 13, 2016, P&G Health determined that Hammond was partially disabled because his "treating

---

[2] The appointments were on September 30, October 28, and December 2 of 2015 and January 13, February 24, March 23, and May 18 of 2016.

physician [] indicated that [he] can return to work with the following restrictions of eight hour shifts only and must wear orthotics in shoes." *Id.* at 694. Thereafter, the 52-week maximum lifetime partial disability benefit clock began to run.

Hammond continued to seek medical treatment. During his August 17, 2016 appointment, Dr. Curran noted that the tall boot and the Allard brace caused Hammond additional pain. He considered Hammond "completely disabled and unable to work" at that time.[3] *Id.* at 369. After an appointment with Dr. Bluman on September 1, 2016, however, Dr. Bluman opined that Hammond could return to work, though he should not stand or walk for more than one hour at a time, nor stand for more than two to four hours total each day.

On January 16, 2017, after fifty-two weeks on STD, Hammond transitioned to LTD. After an examination on February 22, 2017, Dr. Curran noted that Hammond could return to work for an "eight-hour shift with a maximum of four hours walking/standing at work," but also instructed

---

[3] In subsequent appointments in November and December of 2016, Dr. Curran "discuss[ed with Hammond] living with the pain and discomfort and returning to work to his regular job" and Dr. Curran noted that Hammond "needs to make a determination if he is able to continue work or find other suitable employment that doesnt require the hours or amount of standing and walking that his current job requires." *Id.* at 364-367.

Hammond to refrain from working until he completes a follow-up MRI.  *Id.* at 360-361, 402.

On May 30, 2017, Hammond appealed P&G Health's partial disability determination.  As part of the appeal, Dr. Curran sent P&G Health a letter requesting a reduced work schedule for Hammond to allow him time to "undergo surgical management of his right foot peroneal tear."  *Id.* at 685.  Hammond exhausted his 52-week maximum lifetime partial disability benefit limit on June 9, 2017.  On August 15, 2017, P&G Health denied Hammond's appeal.

> Based on a review of [Hammond's] claim file and appeal, it is noted that [his] treating provider, Dr. Curran, documented on February 22, 2017 that [he] could return to work with the restrictions of 8 hours work a day, with a maximum of 4 hours walking.  The letter from Dr. Curran, dated June 19, 2017, requests continued work accommodations for [him], such as a reduced work schedule.  An independent review of [his] claim documentation by a Board Certified Podiatrist concluded that [he] could return to work with the restrictions of walking 2 hours and standing 2 hours consecutively up to 6 hours in an 8 hour day.  [He] could push/pull/lift/carry up to fifty pounds occasionally in an 8-hour day.  [He] would be restricted from climbing stairs or using a ladder in an 8-hour day.  There would be no restrictions for sitting in an 8-hour day.  There was no objective medical documentation provided to support that [his] condition had worsened or that [his] condition is totally disabling as defined by the Plan as of June 9, 2017 to the present.

*Id.* at 347.  Hammond filed this lawsuit on June 25, 2018.

## DISCUSSION

In the ERISA context, "summary judgment is merely a vehicle for deciding the case." *Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006). The court "does not take evidence but rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon, Co.*, 315 F.3d 11, 18 (1st Cir. 2002). Neither party is entitled to factual inferences in its favor. *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005). "The district court sits more as an appellate tribunal than as a trial court" in determining whether to uphold the insurer's benefits decision. *Leahy,* 315 F.3d at 18.

Where, as here, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the court reviews the administrator's decision under an arbitrary and capricious standard, *see* Dkt # 15. While deferential to the administrator's decision, *see Madera v. Marsh USA, Inc.*, 426 F.3d 56, 64 (1st Cir. 2005), arbitrary and capricious review is "not a rubber stamp." *Wallace v. Johnson & Johnson*, 585 F.3d 11, 15 (1st Cir. 2009). Under this standard, a reviewing court "asks whether a plan administrator's determination 'is

7

plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'" *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013), quoting *Leahy*, 315 F.3d at 17.

Hammond contends that P&G Health's denial of continued LTD coverage to him was arbitrary and capricious. According to Hammond, P&G Health lacked a reasonable basis for its June of 2016 determination that he was only partially disabled, and further, P&G Health failed, on appeal, to give proper weight to diagnoses from his treating podiatrist and impermissibly relied on the assessments of a non-examining medical consultant.

### *The June of 2016 Partial Disability Determination*

Hammond asserts that P&G Health should have determined that he was "totally disabled" because his "impairment kept [him] from performing [his] job or any occupation without extreme difficulty since June 7, 2013 when [his] foot became infected by a piece of metal that tore the tendons and was removed from [his] peroneal tendons at the fifth metatarsal."[4] Pl.'s

---

[4] Dr. Curran's notes from this incident reflect that Hammond had substantially recovered from the work accident by the second visit on June 12, 2013: "palpable pedal pulses and neurologic sensation in intact. [T]here is mild erythema and mild edema but healed skin at the site of previously removed foreign body on the base of the fifth metatarsal of the right foot. [N]o sinus tract, no increased erythema, signs of infection have resolved. [S]kin is intact. [N]o significant pain on palpation this date." Suppl. to R.

8

Resp. to A.R. (Dkt # 22) at 6.  Alternatively, he claims that he was only partially disabled until March 2, 2016 when P&G Health "set [him] up for a second opinion." *Id.*

Under the Benefit Plans terms, a partially disabled participant "can perform other useful roles at the same Company site or at other jobs outside the Company . . . [and] is not necessarily prevented from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home," *id.* at 303, whereas, "[u]sually, total disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home," *id.*  As of June of 2016, Dr. Curran, having seen Hammond seven times, concluded that Hammond could work six or eight hours a day with restrictions.  Although Dr. Bluman advised that Hammond refrain from work until a further evaluation, Hammond continued to work part-time at Gillette until early June.  P&G Health's determination at that time that Hammond was partially, and not totally, disabled was amply supported on this record.

### The August 2017 Appeal Denial

Hammond faults P&G Health for selectively relying on favorable medical opinions while ignoring significant contrary opinions in denying his

---

(Dkt # 27) at 5.

appeal.  In particular, Hammond notes that P&G Health's August 15, 2017 letter of denial cites Dr. Curran's June 19, 2017 appeal letter and a portion of Dr. Curran's February 22, 2017 notes stating that he could work with accommodations, while omitting mention of another portion of the February 22, 2017 notes instructing that he refrain from work until further evaluation, and his determination from August of 2016 to February of 2017 that Hammond had "no work capacity."  *Id.* at 360-369.

Although evidentiary cherry-picking can be a factor to support setting aside a plan administrator's discretionary decision, *see Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008), "the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary" or capricious. *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001).  Here, the record reflects that Dr. Curran attributed Hammond's inability to work in August of 2016 to "his seeing two doctors with completely different treatments and the fact that the cam walker messed up his foot and his knee and how he has a dropfoot brace which is irritating the side of his foot and that he doesn't even have a dropfoot."  A.R. at 369.  Dr. Curran, in that visit, noted

> the fact that [Hammond] was walking and working 3/4 of a normal workday and now with the foot and the knee he is completely disabled and unable to work.  [W]e discussed sticking with one physician and he was instructed to make a decision on

10

> who his treating physician is going to be.  I instructed him if he desires my care to discontinue the dropfoot brace and CAM walker and return to the shoes with the accomodative orthotic arch supports and when capable returning to his employment at 3/4 (8 hours per day) fo[r] one month and then full time after one month.  [H]e relates he will consider the options concerning physicians and returning to work.  He will follow up if he continues to want my care.

*Id.*  Thereafter, the record reflects that Hammond visited Dr. Bluman only once more, on September 1, 2017.  As a result of that appointment, Dr. Bluman reported to P&G Health that Hammond may return to work with limits on standing and walking.  *See* A.R. at 421.

Following Hammond's February 22, 2017 appointment with Dr. Curran, P&G Health attempted numerous times to obtain notes from the two follow-up appointments with Dr. Curran, but to no avail.  *See id.* at 328-329.  Dr. Curran's June of 2017 letter in support of Hammond's appeal, however, resolved any conflicting advice in the February notes.  Although the letter noted that a "[r]ecent follow up MRI continued to demonstrate a partial tear of the peroneal tendon at the lateral aspect of the right foot," it also stated the belief that with "surgical management . . . [Hammond] will be able to return to full time employment without restrictions and limitations in the future," and requested that P&G Company to "continue to accommodate [Hammond's] *partial disability.*"  *Id.* at 685 (emphasis added).  In July of 2017, having reviewed his health history, P&G Health's medical consultant

11

agreed with Dr. Curran's June of 2017 assessment: "I agree the claimant required restrictions to his work schedule," *id.* at 357, and that "the claimant can work with [] restrictions, given the appropriate job." *Id.* at 358. In light of the unanimous medical assessments that Hammond could work with restrictions at the time of his appeal, P&G Health's conclusion that Hammond remained partially, and not totally, disabled was not arbitrary or capricious. [5]

---

[5] Hammond also alleges procedural inconsistencies between the expiry date of his appeal, the deadline to submit medical information, and the date P&G Health issued its final decision on his appeal. Even assuming *arguendo* that P&G Health did not fully comply with its stated procedural process, Hammond does not identify the existence of any additional medical information that he could have submitted to assist his appeal after the final decision on August 15, 2017, but before the expiration of his appeal on September 29, 2017. His motion to supplement the record likewise does not include a request to submit medical information from this period. *See* Pl.'s Resp. to A.R. at 46.

**ORDER**

For the foregoing reasons, P&G Health's motion for summary judgment is <u>ALLOWED</u>. The Clerk will enter judgment for P&G Health and close the case.

SO ORDERED.

<u>/s/ Richard G. Stearns</u>
UNITED STATES DISTRICT JUDGE